WILL OF DUNCAN: DUNCAN, Respondent, vs. METCALF, Executor, Appellant.

*May 1—May 31, 1913.*

*Wills: Undue influence: Evidence.*

1. The charge that a will was made as the result of undue influence sounds in fraud and must be established by clear and satisfactory evidence.
2. Declarations of the testator to the effect that he had been importuned by a person in whose favor the will was made are

not competent evidence to prove that undue influence was in fact exerted.

3. The evidence in this case is *held* insufficient to sustain the finding of the trial court that undue influence was used to procure the making of a will by which the testator, who left no widow and but one child (a son thirty-seven years old), gave to his housekeeper, "in recognition of and as a reward for kindness and many acts of assistance bestowed upon" him during the latter years of his life, the use and control of his farm and much of the personal property thereon for a period of twelve years, with remainder to his son, to whom he also gave a separate forty-acre tract and the rest of the personal property.

APPEAL from a judgment of the circuit court for Grant county: GEORGE CLEMENTSON, Circuit Judge. *Reversed.*

This is an appeal from a judgment reversing a decree of the county court which admitted to probate the will of David Duncan, Sr., deceased.

David Duncan, Sr., died from cancer of the stomach July 23, 1910, at the age of sixty-one years. He left no widow and but one child, the contestant, *David Duncan, Jr.,* then aged thirty-seven years. The deceased and contestant's mother were married but did not live together and had been divorced before testator's death.

Rebecca Ackerman, a widow forty-eight years of age, kept house for the deceased for seven or eight years immediately preceding his death. Testator's son had always lived with his mother except one season, twelve years before, when he and his father had farmed together. Since that time the father saw the son but once or twice a year up to the time of his last illness, when the son came to his father's place and remained there most of the time during the last months of decedent's life.

At the time of his death testator owned a farm of 120 acres where he lived, and forty acres of woodland two miles from his home; and personal property of the appraised value of

$1,373.20. When he made the will he had $1,150 in the Glen Haven bank, $1,050 of which was held in certificates of deposit. Testator had these certificates of deposit signed in blank, and the day before he died, July 22, 1910, he transferred them to Rebecca Ackerman.

The will was drawn May 11, 1910, by one Mr. Tate, and signed by the testator and by Mr. Tate, Dr. McLaughlin, and Peter Blum as witnesses. They testified that Duncan was of sound mind and fully comprehended what he was doing and that no one made any suggestions to him as to the disposition of his property; that he directed how the will was to be made; that he read it and then signed it; that there was nothing irregular nor unusual about the transaction; and everything was done in the customary way. He disposed of his property by the will as follows:

"I, David Duncan, of the town of Glen Haven, county of Grant and state of Wisconsin, being of sound mind and memory and mindful of the uncertainties of human life, do make, publish, and declare this my last will and testament in the manner following:

"First. After the payment of my just debts and funeral expenses, I give, devise, and bequeath to my son *David Duncan* [describing forty-acre tract], excepting the cord wood and sawed lumber now on said forty-acre tract, which I give, devise, and bequeath to Rebecca Ackerman.

"Second. In recognition of and as a reward therefor, for the kindness and many acts of assistance bestowed upon me by Rebecca Ackerman during the latter years of my life, it is my wish, will, and request that she have the use and control of [his farm, describing it], for the term and period of twelve (12) years next succeeding the date of my death, and at the expiration of said term or upon the prior death of said Rebecca Ackerman, said described lands shall descend to my son, *David Duncan,* the said Rebecca Ackerman keeping the premises in necessary repair and to pay all taxes or assessments thereon during the time of occupancy by her.

"Third. I give, devise, and bequeath to my son, *David*

*Duncan,* [a horse and some cattle, describing them and] one half ($\frac{1}{2}$) of all the sheep that may be on the premises at the time of my death.

"Fourth. I give, devise, and bequeath to Rebecca Ackerman all the poultry that may be on the premises at the time of my death, also all the household goods and furniture in the house, also two (2) old mares named 'Kit' and 'Polly' and one (1) black mare named 'Daisy' for her use during the time of occupancy by her and then to revert to my son, *David Duncan.* Also all the wagons, buggy, farm machinery, harnesses, etc., for her use during the time of occupancy by her and then to revert to my son, *David Duncan.* Also one half ($\frac{1}{2}$) of the bees on the premises and the other one half ($\frac{1}{2}$) I give, devise, and bequeath to my son, *David Duncan.*

"Fifth. I hereby nominate and appoint *M. W. Metcalf* the executor of this my last will and testament, and hereby authorize him, the said *M. W. Metcalf,* to compound, compromise, and settle any claim or demand which may be against or in favor of my estate."

The above was properly executed by the testator and signed by witnesses. The witnesses testified that Mr. Duncan arose from bed the day the will was made, dressed himself, and was about the house, and while the will was drawn by Mr. Tate Duncan was seated in a chair; that his mind was as clear as usual and perfectly rational and that he displayed an entire control of his mental faculties; that he talked for some time to Mr. Tate about the provisions he wanted put into his will, and seemed to know exactly what he wanted to do; and that at no time did the persons present notice anything to indicate that he was under the influence of any one.

It appears from the record that David Duncan rented the farm in question one year before he bought it and that Mrs. Ackerman was then there and stayed with him; that he then bought it, and she stayed there to keep house for him. She had two children, one about eighteen, the other about fourteen years of age at the time of trial. These children were born after the death of her husband. There is no evi-

dence tending to show that they were the children of testator. These children lived with the mother in the testator's house.

It is claimed by contestant that the evidence tends to show that Mrs. Ackerman lived in illicit relations with deceased and that she was "after him all the time to get his property." Mrs. Ackerman denies the imputation of illicit relations with the deceased and that she ever tried to get his property.

The court found that testator was mentally competent to make a will at the time the will in question was executed. The court also found that the will had been procured by the undue influence of Rebecca Ackerman and others and therefore it was not the will of deceased and hence was not entitled to probate; and rendered a judgment denying probate of the will and reversing the judgment of the county court, which had admitted it to probate. From this judgment the proponent appeals.

*R. A. Watkins,* for the appellant.

For the respondent there was a brief by *Alexander Athey* and *Geo. B. Clementson,* and oral argument by *Mr. Athey.*

SIEBECKER, J.   The trial court refused to admit the proposed will of the decedent to probate, upon the ground that the evidence showed that its execution was procured by undue influence and hence it was not his will. This court in *Will of Slinger,* 72 Wis. 22, 37 N. W. 236, characterizes undue influence as follows:

"Manifestly, it is a subtle species of fraud, whereby mastery is obtained over the mind of the victim by insidious approaches, seductive artifices, or other species of circumvention."

In *Anderson v. Laugen,* 122 Wis. 57, 99 N. W. 437, it was declared:

"To sustain this contention it must appear that there was such influence exercised as to amount to moral coercion,

which resulted in destroying the testator's free will and independent action, and constrained him to act against his will and independent wishes in disposing of his property."

The charge that the will was made as the result of the undue influence of Rebecca Ackerman and her relatives sounds in fraud and requires that it be shown by clear and satisfactory evidence. *Ball v. Boston,* 153 Wis. 27, 141 N. W. 8.

An examination of the record in the case has led us to the conclusion, in the light of these rules of law, that the evidence adduced is insufficient to show that the proposed will was executed by decedent as the result of undue influence. The will is executed with the required formality by the decedent and by witnesses. At the time of its execution decedent was sixty-one years of age. He had prior to this last illness been strong in body and mind and capable of managing his affairs personally. During the winter months preceding the 11th of May, when the will was executed, he had been afflicted with stomach trouble which had caused him considerable pain and confined him to the house and reduced his weight about fifty pounds. A few days before making the will he was informed that his malady was of a cancerous nature and that it would probably prove fatal. This disturbed him much, and he at once spoke to the doctor about making a will, and manifested a desire to be advised by the doctor how to will his property. The doctor declined to do so. On the day the will was made testator gave direction to his son, the contestant, to engage Mr. Tate, the scrivener, to come to testator's home to draw his will. It appears that testator arose from bed, dressed, and while holding his conference with Mr. Tate and executing the will he sat in a chair. Mr. Tate testified that he and decedent were alone in the room while the will was being prepared and that decedent informed him what provisions he wanted in the will, without

any prompting or suggestions, and that deceased enumerated to him the property he had and wanted the will to express the wish that in recognition of Mrs. Ackerman's kindness and assistance to him in the later years of his life he desired to will her the use of the farm as stated in the will. The witness also stated that decedent's mind and memory were as good as usual and that he acted freely in giving his direction to the witness for preparing the will and signing it and requested the witnesses to sign it in his presence. Neither the son nor Mrs. Ackerman gave any assistance or direction throughout the transactions of preparing and executing the will. The other witnesses present on that occasion corroborate these facts as to the making of the will under these circumstances and that the testator seemed rational and normal in mind and acted in an unrestrained and free manner.

It is contended, however, that the circumstances show that testator and Mrs. Ackerman had lived in illicit relations and that she and her parents importuned and unduly influenced him to will her his property. The evidence as to the existence of illicit relations is all circumstantial and so uncertain as to leave the question in serious doubt. There is no direct evidence that testator was importuned by these persons, unless the declarations of testator as testified to by the contestant, Mr. Lyons, and Mr. Orr are proper evidence to establish this fact. Such evidence is not competent to prove that undue influence was in fact exerted. In the case of *Loennecker's Will,* 112 Wis. 461, 88 N. W. 215, it was held that "such declarations 'are admissible only for the purpose of proving the condition of the testator. They afford no substantive proof of fraud, duress, or undue influence, and are admissible for no such purpose.' " Aside from declarations of this nature the record contains practically no evidence that any undue influence was exerted by these persons. Nor do the alleged claims as to Mrs. Ackerman's relations to

the testator, and her conduct and that of testator at the time or before the making of the will, support the finding that the will was proved to be made by undue influence. The contention that the provisions of the will indicate undue influence is wholly without merit. It must be borne in mind that the right to make a will is a sacred one and that every person of sound mind and disposing memory may exercise that right in any way not prohibited by law, and that:

"The highest equity which the courts can consider is the right of an individual to dispose of his property as he chooses. The hope of inheritance which any child may indulge during a parent's life bears no comparison in the eye of the law with the right of disposal by the parent." *Vance v. Davis,* 118 Wis. 548, 95 N. W. 939.

The testator gives us the key to his desire and his reasons for making these provisions for Mrs. Ackerman contained in the will by directing the scrivener that he wanted this declaration inserted: "In recognition of and as a reward therefor, for the kindness and many acts of assistance bestowed upon me by Rebecca Ackerman during the latter years of my life, it is my wish, will, and request that she have the use and control of . . ." his farm, describing it, for the period of twelve years, and then to become the absolute property of his son. What more natural than that he should make these provisions for her in recognition of the years of service before his last illness and the faithful care and attention she gave him throughout his sickness theretofore and which, no doubt, he felt assured she would continue to bestow through his lingering and painful affliction as long as life lasted? His relationship to his son was not such as to suggest that in the natural course of the administering of his business affairs he would, under the circumstances, bestow his property on him to the exclusion of Mrs. Ackerman.

It is argued that the gift of practically all his money to her is proof of the fact that she exerted an undue influence

over him in the management and disposition of his property. In itself this does not tend to prove that she caused him to give it to her through improper means, and there is no evidence tending to show that any approaches or artifices were employed to induce him to give her this money. His declaration to Mrs. Rauch to the effect that he could not live much longer and that he wanted Mrs. Ackerman to have the privilege of living on this property because she had worked for and helped him accumulate it, tends to show that his state of mind was in harmony with the declared wishes in the will. We are unable to discover anything in the facts and circumstances adduced which satisfactorily indicates that Mrs. Ackerman or any other person practiced any fraud or undue influence on the testator to induce him to make this will. The fact of charging this wrong raises no presumption that it was in fact practiced, under the facts and circumstances disclosed. Such wrong can only be said to exist when the facts and circumstances of the case clearly and satisfactorily show it. It is considered that the legal requirement that the alleged undue influence must be shown by clear and satisfactory evidence is not met by the evidence in the case, and that the finding of the trial court to the effect that the will was the product of such influence, which destroyed the testator's free will and independent action and constrained him to act against his will, is clearly wrong and must be reversed. The proposed will is entitled to probate as the last will and testament of the decedent, and the court erred in reversing the judgment of the county court.

*By the Court.*—The judgment is reversed, and the cause is remanded with directions that the court enter judgment admitting the instrument propounded as the will of David Duncan, deceased, to probate, and for further proceedings according to law.